UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GREGORY MURRAY,

      Plaintiff,

-vs-

CITY OF WARREN and MAYOR
JAMES FOUTS,

      Defendants.

Case No. 2:19-cv-13010
Hon. Gershwin A. Drain
Mag. Steven R. Whalen

_____

JONATHAN R. MARKO (P72450)
MARKO LAW, PLLC
Attorneys for Plaintiff
1300 Broadway Street
Fifth Floor
Detroit, MI 48226
(313) 777-7529 / F: (313) 771-5785
jon@markolaw.com

ROBERT T. CAROLLO, JR. (P76542)
KIRK, HUTH, LANGE &
BADALAMENTI, PLC
Attorneys for Defendant
19500 Hall Road, Suite 100
Clinton Township, MI 48038
586.412.4900 phone
586.412.4949 fax
rcarollo@kirkhuthlaw.com

_____

## PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION IN LIMINE

NOW COMES Plaintiff, Gregory Murray, by and through his attorneys, MARKO LAW, PLLC, and for his Response to Defendants' Motions in Limine, states as follows:

1

Plaintiff does not dispute the trial date, does not dispute that Plaintiff does not concur with the relief Defendants request, and does not dispute that Defendants' Motion is a Motion in Limine.  Plaintiff respectfully requests this Honorable Court DENY Defendants' Motion in Limine for the reasons set forth in the accompanying brief.

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GREGORY MURRAY,

        Plaintiff,

-vs-

CITY OF WARREN and MAYOR
JAMES FOUTS,

        Defendants.

Case No. 2:19-cv-13010
Hon. Gershwin A. Drain
Mag. Steven R. Whalen

---

JONATHAN R. MARKO (P72450)
MARKO LAW, PLLC
Attorneys for Plaintiff
1300 Broadway Street
Fifth Floor
Detroit, MI 48226
(313) 777-7529 / F: (313) 771-5785
jon@markolaw.com

ROBERT T. CAROLLO, JR. (P76542)
KIRK, HUTH, LANGE &
BADALAMENTI, PLC
Attorneys for Defendant
19500 Hall Road, Suite 100
Clinton Township, MI 48038
586.412.4900 phone
586.412.4949 fax
rcarollo@kirkhuthlaw.com

---

## BRIEF IN SUPPORT OF PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION IN LIMINE

# QUESTIONS PRESENTED

I.   Are the audio recordings of Mayor Fouts properly excluded when audio/forensics expert Edward Primeau's and other witnesses' testimony can authenticate the recordings and when the recordings are extremely relevant to Plaintiff's claims and for impeachment purposes and are only prejudicial in the sense that all of Plaintiff's evidence is prejudicial to Defendants?

Defendants answer:          Yes.

Plaintiff answers:          No.

II.  Is the testimony of Lolita Davis properly excluded when it is not cumulative or unduly prejudicial and is highly relevant and necessary to support Plaintiff's claims in this case and for impeachment purposes, especially to Plaintiff's claims regarding Defendant Fouts preventing Plaintiff from scheduling further trainings?

Defendants answer:          Yes.

Plaintiff answers:          No.

III. Is Plaintiff's testimony that he was prevented from scheduling training sessions and that he was only permitted to arrange three training sessions total properly excluded when it is highly relevant and necessary to Plaintiff's claims in this case and for impeachment purposes, especially to establish that Defendants took adverse employment actions against Plaintiff which is an element Plaintiff is required to establish?

Defendants answer:          Yes.

Plaintiff answers:          No.

IV.  Is testimony, evidence, or reference to solicitation of "diversity support services" from an outside agency properly excluded when it is highly relevant to Plaintiff's claims and for impeachment purposes, especially for Plaintiff's retaliation claim, and when it is not unduly prejudicial?

Defendants answer:          Yes.

ii

*(Left margin, vertical text):* MARKOLAW.COM   1300 BROADWAY ST. | 5TH FLOOR DETROIT, MI 48226   P: (313) 777-7LAW F: (313) 771-5785   MARKO LAW

Plaintiff answers:          No.

V.    Are Dr. Shiener's testimony and conclusions properly excluded when they are highly relevant and necessary to establish Plaintiff's damages and is scientifically reliable?

Defendants answer:      Yes.

Plaintiff answers:          No.

# <u>INDEX OF AUTHORITIES</u>

## Cases

*United States v. Lang*,
717 Fed. Appx. 523 (6th Cir. 2017)…………………………………………..3, 7

*Dortch v. Fowler*,
588 F.3d 401 (6th Cir. 2009)…………………………………………………..3

*United States v. Dexta*,
136 F. App'x 895 (6th Cir. 2005)……………………………………………..3

*Memphis, Tenn. Area Local, Am. Postal Workers Union v. City of Memphis*,
361 F.3d 898, 902 (6th Cir. 2004)……………………………………………4

*Monell v. Dep't of Soc. Servs.*,
436 U.S. 658 (1978)…………………………………………………………..5

*Adickes v. S. H. Kress & Co.*,
398 U.S. 144 (1970)…………………………………………………………..5

*Doe v. Clairborne County*,
103 F.3d 495 (6th Cir. 1996)…………………………………………………5

*People v. Vasher*,
449 Mich. 494 (1995)………………………………………………………..7

*United States v. Hazelwood*,
979 F.3d 393 (Oct. 29, 2020)………………………………………………..7

*United States v. Lavictor*,
848 F.3d 428 (2017)…………………………………………………………8

*Huddleston v. United States*,
485 U.S. 681 (1988)…………………………………………………………8

*Campbell v. AMTRAK*, No. C 05-5435 CW,
2009 U.S. Dist. LEXIS 80756, at *14–15 (2009)………………………..8

iv

**(Opinion attached as Exhibit 1)**

*United States v. Branch*,
970 F.2d 1368 (4th Cir. 1992)…………………………………………………11

*United States v. Puttick*,
288 Fed. Appx. 242, cert den, 555 U.S. 1061 (2008)……………………..11

*United States v. Leon*,
966 F.2d 1455, [published in full-text format at No. 90-6571,
1992 U.S. App. LEXIS 14323] (6th Cir. 1992)…………………………..11, 12
**(Opinion attached as Exhibit 2)**

*United States v. Sexton*,
119 Fed. App's 735 (6th Cir. 2005)……………………………………..12

*United States v. DeJohn*,
368 F.3d 533 (6th Cir. 2004)……………………………………………13

*United States v. Simms*,
351 Fed. Appx. 64 (6th Cir. 2009)……………………………………..14

*Millender v. Adams*,
187 F. Supp. 2d 852 (E.D. Mich. 2002), aff'd,
376 F.3d 520 (6th Cir. 2004)…………………………………………..14

*United States v. Cooper*,
868 F.2d 1505 (6th Cir.), cert den, 490 U.S. 1094 (1989)…………………14

*Kumho Tire Co v Carmichael*,
526 US 137 (1999)………………………………………………..26, 27

*Allison v. McGhan Medical Corp.*,
184 F.3d 1300 (11th Cir. 1999)………………………………………26

*Daubert v. Merrell Dow Pharmaceuticals*,
509 US 579 (1993)……………………………………………26, 27, 28

*General Electric Co. v Joiner*,

522 U.S. 136 (1997)……………………………………………………..26, 28

*Jahn v. Equine Services*,
233 F.3d 382 (6th Cir 2000)…………………………………………………..28

**Rules**

Fed. R. Evid. 401………………………………………………………………2

Fed. R. Evid. 402………………………………………………………………2

Fed. R. Evid. 403……………………………………………………6, 7, 23–24

Fed. R. Evid. 901……………………………………………………10, 11, 14

Advisory Committee Note to Rule 901(a)…………………………………10

Fed. R. Evid. 104………………………………………………………........11

Fed. R. Evid 404………………………………………………………….7, 8

Fed. R. Evid. 702……………………………………………………….26, 28

Fed. R. Evid. 602.

**Scholarly Articles**

Jeff M Smith & Richard W. Sanders,
*Forensic Voice Identification Utilizing Digitally
Extracted Speech Characteristics*, AUDIO ENGINEERING
SOCIETY: CONVENTION PAPERS, art. 7644,
p.1 (Oct. 2008), http://www.aes.org/e-lib/browse.cfm?elib=14795...........15, 16

John Pike,
*Voice Verification*, GLOBALSECURITY.ORG: HOMELAND
SECURITY,
https://www.globalsecurity.org/security/systems/biometrics-voice.htm
(last visited Sep. 27, 2021)……………………………………………………16

MARKOLAW.COM

1300 BROADWAY ST. | 5TH FLOOR
DETROIT, MI 48226

P: (313) 777-7LAW
F: (313) 771-5785

MARKO LAW

**Books**

Weinstein & Berger,
WEINSTEIN'S EVIDENCE,
Vol. 5 ¶901(b)(5)[01] (1991)……………………………………………………….13

Wright & Gold,
FEDERAL PRACTICE & PROCEDURE: EVIDENCE §7110,
pp. 89 90 & n. 12 (West 2000)……………………………………………………..14

# TABLE OF CONTENTS

QUESTIONS PRESENTED…………………………………………………ii–iii

INDEX OF AUTHORITIES………………………………………………...iv–vii

TABLE OF CONTENTS………………………………………………viii-ix

I.      INTRODUCTION……………………………………………………..1

II.     LAW AND ANALYSIS……………………………………………….2

A. The audio recordings are admissible because expert
   Edward Primeau and other witnesses can authenticate
   them and they are highly relevant for Plaintiff's *Monell*
   claim and for impeachment purposes and is not
   unduly prejudicial.  Therefore, expert Edward Primeau's
   testimony is highly relevant and necessary for Plaintiff's case………2

   1. The Audio Recordings are Relevant……………………………….2

   2. There is no Risk of Undue Prejudice to Defendants………………6

   3. Mr. Primeau's expert testimony, and the lay witness
      testimony of other witnesses, is admissible
      to authenticate the recordings……………………………………..10

B. The testimony from Lolita Davis is admissible
   because it is highly relevant for Plaintiff's *Monell*
   claim, for Plaintiff's claim that Defendant Fouts
   interfered with Plaintiff's ability to perform his
   job duties, and for impeachment……………………………………17

C. Testimony, arguments, or evidence that Plaintiff
   was prevented from scheduling trainings and was limited
   to setting up only three trainings is admissible and
   extremely relevant to establishing that Defendants
   took adverse employment actions against Plaintiff……………………21

MARKOLAW.COM

1300 BROADWAY ST. | 5TH FLOOR
DETROIT, MI 48226

P: (313) 777-7LAW
F: (313) 771-5785

MARKO LAW

MARKO LAW

D. Email solicitation for outside diversity support systems is admissible and necessary to establish that Defendants took retaliatory adverse employment actions against Plaintiff…………………………24

E. Dr. Shiener's expert testimony and conclusions are reliable……………………………………………………….25

III.   CONCLUSION AND RELIEF REQUESTED………………………29

MARKOLAW.COM

1300 BROADWAY ST. | 5TH FLOOR
DETROIT, MI 48226

P: (313) 777-7LAW
F: (313) 771-5785

MARKO LAW

## I.     INTRODUCTION

This Court is familiar with the facts in this case, arising out of the civil rights violations and Constitutional rights violations that Defendants subjected Plaintiff to.

Defendants have filed a master Motion in Limine to exclude the following: audio recordings that Plaintiff argues contain Defendant Fouts making disparaging remarks; testimony from Plaintiff's audio forensics expert, Edward Primeau, to authenticate the audio recordings; testimony of Lolita Davis; Plaintiff's testimony that Defendants prevented him from scheduling training sessions while he was the City of Warren Diversity Coordinator; any evidence that shows that Defendants were attempting to hire Plaintiff's replacement before they had even fired him yet; and Dr. Shiener's testimony and scientific psychiatric conclusions.

All the above-mentioned evidence can be authenticated, and all of it is highly relevant to Plaintiff's substantive claims and highly relevant for impeachment.  None of the above-mentioned evidence carries the risk of unfair prejudice or confusion to a level which could overcome the probative value at all, let alone substantially outweigh the probative value.  Defendants have not come close to establishing otherwise.  Therefore, this Court should deny Defendants' Motion and permit Plaintiff to introduce the above-mentioned evidence at trial.

1

## II.   LAW AND ANALYSIS

### A. The audio recordings are admissible because expert Edward Primeau and other witnesses can authenticate them, and because they are highly relevant for Plaintiff's *Monell* claim and for impeachment purposes and they are not unduly prejudicial.

This Court should find that the audio recordings, and audio forensics expert Edward Primeau's testimony authenticating the same, are admissible because the recordings are highly relevant and extremely necessary for Plaintiff to impeach Defendant Fouts, and possibly other witnesses, and for Plaintiff to support his *Monell* claim.

Defendants argue that the recordings are irrelevant to Plaintiff's claims, that the probative value is substantially outweighed by the risk of undue prejudice, and that the recordings cannot be authenticated.  Defendants' arguments here ignore Federal Rules of Evidence and related caselaw.

### 1. The Audio Recordings are Relevant

These recordings are heavily relevant.  Relevant evidence is "evidence having any tendency to make the existence of any fact of consequence to the determination of the action more probable or less probable than it would be without the evidence".  Fed. R. Evid. 401.  Evidence which is relevant is admissible unless the United States Constitution, a federal statute, the other Federal Rules of Evidence, or other rules prescribed by the Supreme Court dictate otherwise.  Fed. R. Evid. 402.

2

"**This threshold is low, and evidence is relevant if it 'advance[s] the ball' one inch**". *United States v. Lang*, 717 Fed. Appx. 523, 538 (6th Cir. 2017) (quoting *Dortch v. Fowler*, 588 F.3d 401 (6th Cir. 2009)).  **The rules regarding relevancy "strongly favor admissibility".** *Id.*

Additionally, <u>**the Sixth Circuit recognizes "the strong probative force of impeachment evidence**</u>. *Id.* (citing *United States v. Dexta*, 136 F. App'x 895, 906–07 (6th Cir. 2005).

These recordings are very relevant to impeach Defendant Fouts, or other defense witnesses.  Defendants have always maintained in this case, and will do so at trial, that Defendant Fouts is a non-racist individual and a great guy with no discriminatory biases.  For example, in their Motion for Summary Judgment, Defendants cite testimony from defense witnesses testifying: that Defendant Fouts never said anything insensitive during his four years with the City of Warren; that Defendant Fouts never disparaged African Americans, disabled people, (ECF No. 109, PageID 2708).

Further, Defendants noted that "Mayor Fouts testified to the passion he has for diversifying employment at Warren to track the changes in the community"; that "Mayor Fouts further disavowed ever using the "n" word or making the offensive statements in the audio clips that Murray hopes to rely on in this case"; and that Mayor Fouts "found the audio clips 'offensive' and 'disgusting'" and that he could

not "imagine saying something like that". *Id.* at 2709. There is no substantially similar evidence Plaintiff can use to impeach Defendant Fouts if Defendants were to continue to claim Defendant Fouts has never displayed any kind of discriminatory animus towards minorities, or similar.

Plaintiff also requires evidence to establish "that a municipal policy or policy of inaction was the moving force behind the violation" of Plaintiff's constitutional rights for his *Monell* claim, and the audio recordings here are very relevant to that claim. Defendants recognized this in their Motion for Summary Judgment: "Murray hired an 'expert' to suggest that lewd audio clips purporting to be the voice of Mayor Fouts and released in 2016 - before Murry took the job at Warren – somehow avoid summary judgment on the *Monell* claim." *Id.* at 2720.

Plaintiff also established the relevance of the recordings to his *Monell* claim in his response to Defendants' Motion for Summary Judgment. Plaintiff must be able to present evidence to establish (1) that agents of the municipality acting under color of state law (2) violated the plaintiff's constitutional rights, and (3) that a municipal policy or policy of inaction was the moving force behind the violation. *Memphis, Tenn. Area Local, Am. Postal Workers Union v. City of Memphis*, 361 F.3d 898, 902 (6th Cir. 2004). The audio recordings support the third element, that Defendants adopted a municipal policy or policy of inaction that was the moving force behind the violation of Plaintiff's constitutional rights.

4

Plaintiff can establish the municipal policy or policy of inaction even if it has "not received formal approval through the official's decisionmaking channels". *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978). This is due to "the persistent and widespread discriminatory practices of state officials . . . . [S]uch practices of state officials could well be so permanent and well settled as to constitute a 'custom or usage' with the force of law". *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 167–68 (1970).

The audio recordings are relevant to show that the City of Warren policy or policy of inaction is "so permanent and well settled as to constitute a 'custom or usage' with the force of law". *Id.* The fact that they were recorded prior to Plaintiff's work for Defendants shows that the municipal policy or policy of inaction alleged here is permanent, well-settled, and that there is a clear and persistent pattern of violating federal rights. It also shows that Defendants had notice or constructive notice of Defendant Fouts' persistent pattern of violating federal rights years before Plaintiff started working there. These are necessary elements to Plaintiff's *Monell* claim, and there is no substantially similar evidence available to establish these elements. *See Doe v. Clairborne County*, 103 F.3d 495, 508 (6th Cir. 1996).

Most of Defendants' arguments regarding the relevance of the audio recordings are irrelevant themselves. It does not matter if Defendants cannot imagine any use for these recordings beyond using them as direct evidence of racial

discrimination or as using them to support Plaintiff's *McDonnell Douglas* analysis for racial discrimination. It does not matter that this Court did not reference the audio recordings as its basis for denying summary judgment on Plaintiff's *Monell* claim. It does not matter that Plaintiff deposed Jeff Schroder and James Hartley and it does not matter whether either of them could authenticate the recordings. None of this establishes that the recordings are irrelevant or inadmissible.

It likewise does not matter that Defendant Fouts denied using the "n word" and "denied" making the offensive statements in the audio recordings. It is worth noting that Defendant Fouts could not deny that any of the statements were his voice when asked under oath. Defendant Fouts instead testified that he could not remember if it was him on the recordings and admitted that they sound like him. (ECF No. 109-7, PageID 3155 – Mayor Fouts' dep. filed under seal at 11:16–12:3; 14:3–7).

Therefore, these audio recordings are clearly relevant for impeachment and for Plaintiff's *Monell* claims and Defendants have not established otherwise.

## 2. There is no Risk of Undue Prejudice to Defendants

Defendants had to establish that the risk of unfair prejudice substantially outweighs the probative value of the recordings, yet they have utterly failed to allege unfair prejudice. Fed. R. Evid. 403 states that this Court "may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or

more of the following: unfair prejudice, confusing the issues, misleading the jury,

undue delay, wasting time, or needlessly presenting cumulative evidence".

Like the relevancy rules, this rule strongly favors admissibility. *United States*

*v. Lang*, 717 Fed. Appx. At 538.   In *United States v. Lang*, the Sixth Circuit

considered the standard for determining admissibility under Fed. R. Evid. 403:

> As one court has aptly described the standard:
>
> In this context, **prejudice means more than simpl[e] damage to the opponent's cause.  <u>A party's case is always damaged by evidence that the facts are contrary to his contentions, but that cannot be grounds for exclusion.</u>  What is meant here is an undue tendency to move the tribunal to decide on an improper basis, commonly, though not always, an emotion one.  In the pungent phrase of Judge Sloan . . . the party 'is entitled to hit as hard as he can above, but not below, the belt.'**
>
> *Lang*, *supra* (quoting *People v. Vasher*, 449 Mich. 494 (1995)).

The Sixth Circuit has clarified that racist and misogynistic language is

admissible if it is offered for an admissible purpose, if that purpose is material or at

issue, and if the evidence is probative.  *United States v. Hazelwood*, 979 F.3d 393,

411 (Oct. 29, 2020).  The offensive language has been held inadmissible where it is

offered to prove that a party has a character trait and that on the occasion at issue in

this case, that party acted in accordance with that character trait.  *Id.* (citing Fed. R.

Evid. 404).  Courts frequently deny this type of evidence only because usually it is

"not 'probative of a material issue other than character'".  *Id.*, *see also*, *e.g.*, *United*

*States v. Lavictor*, 848 F.3d 428, 445 (2017) (recognizing that evidence of "other crimes, wrongs, or acts" is inadmissible if offered to prove the character of a person but that a party can introduce "other acts" evidence under Fed. R. Evid. 404 if it is introduced for a valid purpose); *Huddleston v. United States*, 485 U.S. 681, 689 (1988) (recognizing that evidence of "other crimes, wrongs, or acts" is admissible if it is relevant).  Evidence of "other acts" are properly admitted to establish motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident.  Fed. R. Evid. 404(b)(2).

The Northern District Court of California provides persuasive authority regarding the same issue:

> The Court rejects the argument that, simply because [defendant's agent's] alleged comments were made a number of years before the employment decisions at issue, they should have been excluded at trial. Although more recent statements may have been more probative of discriminatory animus, the jury was entitled to evaluate the persuasiveness of the evidence for itself.  [Defendant's] counsel highlighted the age of the statements, and the jury could very well have come to the conclusion that [defendant's agent] had changed his opinion of African-Americans between 1999 and 2004.  But the probative value of the evidence was substantial, particularly given the nature of the statements at issue.  **And, even though the statements may have been "inflammatory," to use [defendant's] word, racist statements are by their very nature inflammatory.  This does not provide a basis to exclude them as evidence.**
>
> *Campbell v. AMTRAK*, No. C 05-5435 CW, 2009 U.S. Dist. LEXIS 80756, at *14–15 (**Opinion attached as Exhibit 1**).

As explained above, the recordings are very relevant and very probative. Plaintiff is introducing the evidence for impeachment and to establish necessary elements to Plaintiff's *Monell* claim.  Plaintiff is not introducing the evidence to inflame the jury or to cause prejudice.  All of Plaintiff's evidence will prejudice Defendants in some way.

Further, Defendants have only alleged "obvious prejudice" rather than alleging that the risk of unfair prejudice that the recordings carry **substantially** outweighs the probative value.  As the Northern District of California explained, racially charged statements and other statements which are inappropriate and very offensive towards minorities are always inflammatory, but that does not mean that they risk unfair prejudice against the speaker.

Defendants support their claim that the audio recordings' risk of undue prejudice substantially outweighs the probative value by alleging a lack of temporal proximity and noting that this Court also mentioned a lack of temporal proximity "between Defendant Fouts' purported racist comments and Plaintiff's termination from employment".  (ECF No. 132, PageID 4307).  As the Northern District of California recognized, this type of argument should be presented to the jury to determine the weight of the evidence.  It does not speak to admissibility.

Defendants have not explained what prejudice is at risk, how that prejudice is unfair, or how the prejudice would substantially outweigh the probative value of the

9

evidence.  Defendants merely conclude that a lack of temporal proximity reduces the probative value of the evidence.  This is insufficient to exclude the recordings.

### 3. Mr. Primeau's expert testimony, and the lay witness testimony of other witnesses, is admissible to authenticate the recordings

Plaintiff can authenticate the audio recordings with Mr. Primeau's expert testimony based on his scientific audio forensics expertise and scientific methods and with testimony from lay witnesses in this case that the voice on the recordings sounds like Defendant Fouts.  In fact, the expert witness and lay witness testimony regarding the recordings go above and beyond the low threshold required to authenticate evidence in the Sixth Circuit.

First, the Federal Rules of Evidence establish that Plaintiff can authenticate the recordings with witness testimony.  Fed. R. Evid. 901(a) states: "To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is."   The Advisory Committee Note to Rule 901(a) explains the "requirement" of authenticating exhibits as follows:

> Authentication and identification represent a special aspect of relevancy.  Thus a telephone conversation may be irrelevant because of an unrelated topic or because the speaker is not identified.  The latter aspect is the one here involved.  Wigmore describes the need for authentication as "an inherent logical necessity. (citations omitted).

10

Fed. R. Evid. 901(b) is a non-exhaustive of list of illustrative examples of ways in which exhibits may be shown to be genuine.  The Rule itself explicitly allows Plaintiff to authenticate the recordings in this manner:

> Opinion About a Voice. **An opinion identifying a person's voice — whether heard firsthand <u>or through mechanical or electronic transmission or recording</u> — based on hearing the voice at <u>any time</u> under circumstances that connect it with the alleged speaker**…

Fed. R. Evid. 901(b)(5).

Fed. R. Evid. 104(b) respects the jury's role to determine the authenticity (and hence relevance) of the recordings.  *United States v. Branch*, 970 F.2d 1368, 1370 (4th Cir. 1992), a Fourth Circuit case which has been cited with approval by the Sixth Circuit (*see, e.g., United States v. Puttick*, 288 Fed. Appx. 242, 247; 2008 U.S. App. LEXIS 16387 at *11 (6th Cir. 2008), cert den, 555 U.S. 1061 (2008)), held: "Although the district court is charged with making this preliminary determination, <u>**because authentication is essentially a question of conditional relevancy, the jury ultimately resolves whether evidence admitted for its consideration is that which the proponent claims**</u>." *Branch, supra* at 1371.

Second, Sixth Circuit case law regarding audio recordings establishes a liberal approach when determining admissibility.  For example, in *United States v. Leon*, 966 F.2d 1455, [published in full-text format at No. 90-6571, 1992 U.S. App. LEXIS 14323, *3–4] (6th Cir. 1992) **(Opinion attached as Exhibit 2)**, a criminal defendant

claimed that the voice on an audio recording admitted into evidence was not his.  He had a witness testify that his voice was too similar to someone else's to positively identify his voice on the recording.  *Id.*

**The government, however, provided a phonetic sciences expert to testify that he determined the voice on the recording was, in fact, the voice of the defendant.** *Id.* **at \*3-4.  The defense tried to poke holes in the government's expert's analysis and methods, but the trial court allowed the expert's testimony and the recordings to get to the jury**. *Id.*

The trial court noted that the defendant had the opportunity to provide its own expert to rebut the government's expert and the defendant had the opportunity to cross examine the government's expert.  *Id.* at \*10.  The Sixth Circuit affirmed, holding that the expert's testimony was properly admitted.  *Id.*  It reasoned that **any shortcomings the defense found in the expert's testimony <u>would "go to the weight of the testimony rather than to its admissibility."</u>** *Id.* at \*11.  <u>**The jury was entitled to hear the audio and weigh the different evidence about the voice identification and come to its own conclusion.**</u>  *Id.*; *see also United States v. Sexton*, 119 Fed. App's 735, 742 (6th Cir. 2005) **(holding "the testimony of a witness that the item is what it purports to be" is sufficient to authenticate a voice on an audio tape**).

MARKOLAW.COM

1300 BROADWAY ST. | 5TH FLOOR
DETROIT, MI 48226

P: (313) 777-7LAW
F: (313) 771-5785

Ⓜ MARKO LAW

The *Leon* court allows for Plaintiff to authenticate the disputed voice on the audio recordings with an audio expert's opinion, and then leaves it up to the jury to determine how much weight to give Plaintiff's authenticating evidence. Defendants here were free to find a rebuttal expert, they have known about Plaintiff's plans to rely on Mr. Primeau's opinions, and they will have the opportunity to cross examine Mr. Primeau to cast doubt on the reliability of his opinions as well as they are able.

There is additionally no requirement that a party to the conversation or the maker of the recording testify. *See* Weinstein & Berger, WEINSTEIN'S EVIDENCE, Vol. 5 ¶901(b)(5)[01] (1991) (citing *Auerbach v. United States*, 136 F.2d 882, 885 (6th Cir. 1943). In *Auerbach v. United States*, a witness was allowed to testify to a conversation that he overheard while standing in a hotel lobby telephone booth. The witness could see neither of the speakers but identified the defendant's voice as one he was acquainted with. The Court upheld the conviction even though the witness qualified his opinion as "to the best of [his] belief" and admitted the possibility he may have been mistaken.

Additionally, Plaintiff is not required to establish a "chain of custody" which would prove that the recordings are the "originals". The Sixth Circuit has held that either chain of custody **or testimony sufficient to support the accuracy of the evidence** is required. *United States v. DeJohn*, 368 F.3d 533 (6th Cir. 2004).

13

In *United States v. Simms*, 351 Fed. Appx. 64, 68 (6th Cir. 2009), the Sixth Circuit considered whether a copy of a copy of an incriminating CD which contained a phone call allegedly between the criminal defendant and his girlfriend could be authenticated. *Id.* at 65–66. The *Simms* court held that as long as a foundation was established **by *either* a chain of custody *or* testimony that establishes the accuracy of the evidence**, it was within the trial court's discretion to admit the tapes. *Id.* at 68.

Federal Practice & Procedure: Evidence explains:

> **Under this minimal standard, <u>the lay opinion may be received even where the 'circumstances connecting it with the alleged speaker' are doubtful, the witness had only limited exposure to the voice, the quality of the witness's perception was poor, the witness's credibility is in question, or the time interval between hearing the voices to be compared is so great as to suggest the witness's memory of the first voice might be insufficient to make the comparison</u>.**

> Wright & Gold, Federal Practice & Procedure: Evidence §7110, pp. 89-90 & n. 12 (West 2000) (citing *Auerbach v. United States*, 136 F.2d 882, 885 (6th Cir. 1943).

Sixth Circuit cases considering FRE 901(b)(5) also confirm **that a witness need demonstrate only "minimal familiarity" with the speaker's voice**. *Millender v. Adams*, 187 F. Supp. 2d 852, 869 (E.D. Mich. 2002) aff'd, 376 F.3d 520 (6th Cir. 2004); *United States v. Cooper*, 868 F.2d 1505, 1519 (6th Cir.), cert den, 490 U.S. 1094 (1989); *United States v. Simms*, *supra*.

14

As explained below, the fact that Mr. Primeau is an audio forensics expert who employed a scientific method to form his opinions regarding who is speaking on the recordings only adds to the reliability of the authentication, it is more than what is required.

Mr. Primeau's expert report establishes his credentials as an audio forensics expert and that he followed the standard procedures provided by the Scientific Working Group for Digital Evidence and by the National Institute of Standards and Technology. **(Exhibit 3, Primeau's Expert Report at 1–2).**

Mr. Primeau's report explains that the biometric voice comparison is "the scientific observation and comparable analysis between 'known' and 'unknown' recordings". *Id.* He lists multiple reputable sources' comments on how this method is the standard and why it is trustworthy:

> Voice identification is a reliable testing method that dates to Bell Labs in 1944 and is still successfully practiced today. Biometric Voice Identification testing works by digitizing a profile of a person's speech to produce a stored model voiceprint or template.
>
> Jeff M Smith & Richard W. Sanders, *Forensic Voice Identification Utilizing Digitally Extracted Speech Characteristics*, Audio Engineering Society: Convention Papers, art. 7644, p.1 (Oct. 2008), http://www.aes.org/e-lib/browse.cfm?elib=14795.
>
> ***
>
> With new capabilities in technology available through third-party applications and self-programmed interfaces, the task of manual voice identification can be enhanced and carried out with greater confidence.

This paper is presented to give a broad look at characteristics in the voice that, when digitally extracted and analyzed, can provide insightful clues to the speaker-dependent qualities in one's voice.

*Id.*

\*\*\*

Biometric technology reduces each spoken word to segments composed of several dominant frequencies called formants. Each segment has several tones that can be captured in a digital format. The tones collectively identify the speaker's unique voiceprint. Voice prints are stored in databases in a manner like the storing of fingerprints or other biometric data.

John Pike, *Voice Verification*, GLOBALSECURITY.ORG: HOMELAND SECURITY, https://www.globalsecurity.org/security/systems/biometrics-voice.htm (last visited Sep. 27, 2021).

There are also lay witness testimony in this case that can authenticate the recordings. For example, Lorie Barnwell, the treasurer for the City of Warren at the time, testified "it does sound like him on the tapes". **(Exhibit 4, Barnwell Dep. at 44:10–11).** Ethan Vinson, the City's City Attorney, agreed. **(Exhibit 5, Excerpt from Vinson Dep. at 77:8–10, filed under seal).** Amanda Mika, Defendant Fouts' assistant, agreed as well. **(Exhibit 6, Excerpt from Mika Dep. at 63:18–20, filed under seal).** James Hartley and Jeffrey Schroder, both of whom used to work for the mayor before Plaintiff was hired, agreed as well. **(Exhibit 7, Excerpt from Hartley Dep. at 22:3–7, filed under seal); (Exhibit 8, Excerpt from Schroder Dep. at 18:19–19:4, filed under seal).** Joe DiSano, a political consultant with

MARKOLAW.COM

1300 BROADWAY ST. | 5TH FLOOR
DETROIT, MI 48226

P: (313) 777-7LAW
F: (313) 771-5785

MARKO LAW

whom Defendant Fouts consulted, testified that Defendant Fouts probably only appointed a lot of African Americans because he recognized that the public audio recordings of Defendant Fouts using racist, and otherwise nasty and discriminatory, statements created a reputation problem that he had to fix. **(Exhibit 9, DiSano Dep. at 119:6–16).** Each and every one of these witnesses can therefore authenticate Defendant Fouts' voice on the audio recordings under the Federal Rules of Evidence.

Plaintiff does not need to prove that the recordings contain Defendant Fouts' voice by 100% certainty to authenticate the recordings. Defendants are free to cross-examine Mr. Primeau and other witnesses who can authenticate the recordings, as they are free to do with all witnesses Plaintiff produces, and then the jury may determine whether they believe Mr. Primeau or any of the other witnesses who can authenticate the recordings.

### B. The testimony from Lolita Davis is admissible because it is highly relevant for Plaintiff's *Monell* claim, for Plaintiff's claim that Defendant Fouts interfered with Plaintiff's ability to perform his job duties, and for impeachment.

This Court should not exclude Lolita Davis' testimony from this case because it is extremely relevant to Plaintiff's *Monell* claim, because it is extremely relevant to Plaintiff's claims that Defendant Fouts interfered with Plaintiff's ability to perform his job duties, because it is extremely relevant for impeachment, and

17

because Ms. Davis' testimony is not unnecessarily cumulative or unfairly prejudicial.

Ms. Davis testified regarding the training session she conducted with Plaintiff:

Q: Okay. I want you to describe, Ms. Davis, in as detailed as possible what happened.

A: Well, I mean, it was in 2017, so a lot of it I don't remember. **But I do remember during the training session, that he did make comments about a person with a disability who had Tourette, and he had made several, in my opinion, inappropriate comments.**

Q: And what were those comments?

A: **It was comments being made regarding the ADA, it was sex-based comments, it was age-based comments.**

Q: Okay. But what specifically? Like what did he say about people -- let's start with the sex. What did he say that were sexist comments?

A: And I think that -- let me just -- if it didn't directly come from him, my opinion is that, you know, when you're conducting training, and if you have one person that may be disruptive within a group, that other people tend to behave the same way. So there was conversations with the mayor where he may have made the comment -- where he made the comment about the disability, then it could have been somebody else who jumped on the bandwagon, and then it may have been a comment about sex. So like, if it's a pregnant person, you know, you can't discriminate against them because of their pregnancy. You know, it was a comment that was regarding age, as far as the age of an employee and them being able to -- I can't remember if it was -- I think it was to be a part of the fire department. There was a comment based on -- with Title VII, as far as race and felony convictions, where if a person had a felony conviction, that that person shouldn't be hired. And that comment could have came, like, from the fire -- from the police department. **So he set the stage for it to be more -- one of the most disruptive training sessions that I had.**

**Q: And how many training sessions have you done in your whole life, ma'am?**

**A: Anywhere from -- I've done a lot.· Maybe 200, 250.**

**Q: And the mayor set the stage for this being the most disruptive training you've ever done in your whole career?**

**A: Yes.**

(ECF No. 115-23, PageID 3587–88).

Ms. Davis goes on to testify about the aftermath of Defendant Fouts'

disparaging comments and those he inspired and encouraged others to make:

> I was, you know, disappointed regarding the behavior during the training. . . I know that I had a conversation with the – because it was being recorded to be used for later training, and I know that I had a conversation with the – was it the public relations specialist?  Because – and they couldn't use the video to train other people because it was just too – it wouldn't have been worthwhile.  So they decided not to use the video for future training.

*Id.* at PageID 3588.

Ms. Davis' testimony is important for and relevant to Plaintiff's *Monell* claim,

because it establishes that very early on in Plaintiff's career with Defendants,

Defendant Fouts made disruptive, inflammatory and discriminatory remarks and

actions in front of municipal employees which encouraged the municipal employees

to make disruptive, inflammatory and discriminatory remarks and actions.  This

shows that Defendants upheld, enforced, and acquiesced to a policy of action or

19

inaction which fails to take remedial action when municipal employees discriminate against protected groups, and which celebrates municipal employees discriminating against protected groups.

Ms. Davis' testimony also establishes that Defendant Fouts interfered with and derailed one of the few trainings that Defendant Fouts permitted Plaintiff to conduct. This is important to show that Defendants took adverse employment actions against Plaintiff by preventing Plaintiff from performing his job duties. This is also important to impeach Defendant Fouts when he testifies that he was passionate about improving the rampant racism within the City of Warren's municipal force, or similar. (*See* ECF No. 109, PageID 2709).

Finally, Ms. Davis' testimony will explain the email that she sent Plaintiff in order to establish that she contacted Plaintiff to ask why her department had not been invited to a diversity training that was meant to be for all department heads. *Id.* This Court has explicitly recognized that this testimony is relevant, as it relied on the reasonable inferences drawn from Ms. Davis' email to find that Defendant Fouts only permitted Plaintiff to conduct one EEOC training for the City's department heads. (ECF No. 132, PageID 4295).

Ms. Davis' testimony is not needlessly cumulative. Ms. Davis provides the perspective from someone who has conducted 200-250 trainings besides the one that

she conducted with Plaintiff.[1]  Defendant Fouts and Plaintiff are adversaries in this case and therefore their opinions of the training are biased.  Ms. Davis can therefore provide unbiased testimony different from either Defendant Fouts' or Plaintiff's testimonies.

Defendants concerns about the "risk" that the jury would accept Ms. Davis' sworn testimony as evidence regarding the training is not a "risk" that needs mitigating.  The jury should accept Ms. Davis' sworn testimony as evidence.  Ms. Davis has absolutely zero reason to exaggerate or to testify based on her emotions instead of her personal knowledge.

Ms. Davis' testimony carries no risk of unfair prejudice, it is simply what she personally remembers from the training.  A witness can testify her own personal knowledge.  Fed. R. Evid. 602.

Therefore, Defendants have not established why Ms. Davis' testimony is excludable and Plaintiff has established that her testimony is relevant and necessary for Plaintiff's case, thus Ms. Davis' testimony should be admitted.

**C. Testimony, arguments, or evidence that Plaintiff was prevented from scheduling trainings and was limited to setting up only three trainings is admissible and extremely relevant to establishing that Defendants took adverse employment actions against Plaintiff.**

---

[1]It is unclear why Defendants imply that Ms. Davis was not personally involved in the training because, as is clear from her testimony above, she was.

21

Plaintiff's testimony that he was prevented from scheduling trainings and that he was limited to setting up only three trainings is properly admitted as it is of the utmost relevance and importance for Plaintiff to be able to establish that Defendants took adverse employment actions against him.

Plaintiff's testimony here is important to establish that Defendants took adverse employment actions against Plaintiff, which requires Plaintiff to show that Defendants prevented Plaintiff from conducting trainings. Plaintiff testified that, at most, he conducted four trainings before Defendant Fouts stopped Plaintiff from conducting any more. (ECF 109-4, PageID 2928).

Defense counsel asked misleading questions about "trainings" to trick Plaintiff into "admitting" there were more than four and that Defendant Fouts did not prevent Plaintiff from conducting trainings. Plaintiff recognized as much: "Oh. **I see the way you're doing it**", and "the fifth would have been the training for the three employees and the sixth **in the way you're framing it** is the one for the interpreter". *Id.* at 2940–41. Plaintiff later confronted defense counsel about her insistence on naming events in Plaintiff's schedule "trainings": "[W]hat actually happened were in-services. **They were not really trainings. Your use of the word is not really compatible with what happened**" and, as the only person involved in the deposition with experience conducting trainings for employees to adhere to civil rights laws, explained: "**Trainings are normally a minimum of four hours, and**

22

**they include interactive exercises, role playing, and things of that nature. So we've been going all along as if these things were actual full trainings and they were not**". *Id.* at 3012–13.

Defendants have consistently argued that Plaintiff conducted more trainings than the three or four Plaintiff admitted to conducting in his deposition. (ECF No. 109, PageID 2701); (ECF No. 142, PageID 4557). Plaintiff cannot be expected to rebut this without providing evidence that Defendant Fouts prevented Plaintiff from scheduling further trainings beyond those three or four.

Defendants argue that this testimony should be excluded as untrue, intentionally confusing, and prejudicial but, as established above, Plaintiff's testimony regarding the training sessions is reliable, and Defendants have not established how this testimony could possibly be confusing or prejudicial, let alone how the risk of confusing the issues or unfair prejudice substantially outweighs the probative value of the testimony. This is likely because the only confusion or prejudice at risk from this testimony is the jury may determine that Plaintiff's evidence regarding the trainings is true and that Defendants' evidence regarding the same is false.

Plaintiff's testimony here establishes one of the adverse employment actions that Plaintiff must prove to succeed on multiple claims in this case. *See* Fed. R.

23

Evid. 403.  The weight of the probative value of this testimony is therefore colossal, and the risk of any confusion or unfair prejudice is miniscule if it exists at all.

### D. Email solicitation for outside diversity support systems is admissible and necessary to establish that Defendants took retaliatory adverse employment actions against Plaintiff.

The evidence that Plaintiff has produced multiple times in this case to establish that Defendants began looking to replace Plaintiff well before they terminated him, showing that they decided to terminate Plaintiff in response to Plaintiff's complaints about the City's refusal to commit to diversity.

Plaintiff must show that Defendants subjected him to adverse employment actions, so it is unclear how Defendants could possibly think that Plaintiff's evidence establishing this should be excluded.   As alleged in Plaintiff's response to Defendants' Motion for Summary Judgment, this evidence establishes:

> Mayor Fouts was in contact with potential replacements at least a week before terminating Mr. Murray, on December 1, 2017, demonstrating that the termination was in response to Mr. Murray complaining about the Mayor's attempts to prevent Mr. Murray from enforcing civil rights laws and not a spur of the moment decision. . .

(ECF No. 123, PageID 3904).

It is extremely important that Plaintiff can present evidence that the adverse employment actions Defendants took against Plaintiff were retaliatory for Plaintiff's engaging in protected civil rights activities.

24

Defendants claim that "[i]t is undisputed that Mayor Fouts and City Attorney Vinson (to whom the solicitation was directed) never met with Exodus and had no discussion with each other or anyone about hiring a replacement for Murray until *after* his separation from the city's employment". (ECF no. 142, PageID 4559). Defendants have consistently stated that disputed facts in this case, which must get to the jury to be resolved, are "undisputed", but that does not make them so.

Defendants also claim this evidence should be excluded because it is "highly prejudicial and irrelevant". *Id.* They argue that it is highly prejudicial and irrelevant **only** because this Court did not refer to this evidence when denying summary judgment on most of Plaintiff's claims. *Id.* This Court's choice not to refer to this evidence does not mean the evidence is "highly prejudicial" or "irrelevant".

There are no reasons, and Defendants have not come up with any, why this evidence should be excluded.

### E. Dr. Shiener's expert testimony and conclusions are reliable and therefore admissible.

As part of Plaintiff's treatment after the incidents of this case, Plaintiff saw Dr. Gerald Shiener, M.D., for a psychiatric evaluation. Defendants' argument that Dr. Shiener is unqualified to testify as an expert on Plaintiff's psychiatric damages is absurd. Dr. Shiener is easily qualified under *Daubert*.

Trial courts are charged with the function of acting as "gatekeepers" to ensure that all scientific evidence and technical expert evidence admitted is not only relevant, but reliable. *See Kumho Tire Co v Carmichael*, 526 US 137 (1999). However, a district court's "gatekeeper role is not intended to supplant the adversary system or the role of the jury." *Allison v. McGhan Medical Corp*., 184 F.3d 1300, 1311 12 (11th Cir. 1999).

Fed. R. Evid. 702 governs the admissibility of expert testimony as follows:

If scientific technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

*Daubert* held that Fed. R. Evid. 702 merely requires the trial judge to ensure that an expert's testimony is relevant to the issues. *Daubert v. Merrell Dow Pharmaceuticals*, 509 US 579, 592 (1993). Pertinent evidence based on scientifically valid principles will satisfy those demands, even if the defendants claim that the scientific evidence is not generally accepted in the field. *Daubert* was intended to "allow district courts to admit a somewhat broader range of scientific testimony than would have been admissible [prior to this case]". *General Electric Co. v Joiner*, 522 U.S. 136, 142 (1997).

26

The *Daubert* Court established the following nonexclusive, four-part test to be utilized by trial courts in determining whether the proposed expert testimony or evidence is reliable: (1) Can the underlying scientific theory or technique be tested; (2) Has the theory or technique been subjected to peer review and publication; (3) Is there a known or potential rate of error for the particular scientific technique; and (4) Whether the underlying scientific technique has achieved a particular degree of acceptance within the relevant scientific community. *Id.* at 592, 594.

**When the Supreme Court revisited this issue in *Kumho*, it relaxed the emphasis on the four factors suggested in Daubert, clearly noting that the above-listed factors are not exclusive and that <u>it is the trial court's function to examine those factors which bear upon the reliability of a particular opinion in light of the circumstances of each particular case</u>.** *Kumho*, 526 U.S. at 137, 150 52. *Daubert* and its progeny emphasized that expert witness testimony was not to be subjected to an inflexible and unattainable standard. The *Daubert* Court noted:

> Of course it would be unreasonable to conclude that the subject of scientific testimony must be "known" to a certainty. Arguably, there are no certainties in science. [*Id.* at 590 (emphasis added).]

There is no requirement of "absolute certainty" in the scientific arena. The *Daubert* Court emphasized the important role of "inference" in expert scientific testimony and stressed that expert opinions may properly be based upon logical extensions of what is known, stating:

MARKOLAW.COM

1300 BROADWAY ST. | 5TH FLOOR
DETROIT, MI 48226

P: (313) 777-7LAW
F: (313) 771-5785

Ⓜ MARKO LAW

But in order to qualify as "scientific knowledge", an inference or assertion must be derived by the scientific method. Proposed testimony must be supported by appropriate validation – - i.e., "good grounds", based on what is known. In short, the requirement that an expert's testimony pertain to "scientific knowledge" establishes a standard of evidentiary reliability. [Id. at 590 (emphasis added)].

Experts are permitted a wide latitude in their opinions, **so long as "the expert's opinion [has] a reliable basis in the knowledge and experience of the discipline."** *Daubert*, 509 U.S. at 592. **The Court explained that relevance of proposed scientific testimony is established through Rule 702's "'helpfulness' standard" which "requires a valid scientific connection to the pertinent inquiry as a precondition for admissibility."** *Id.* at 591-92.

**Courts should not confuse scientifically valid "inferences" or "assertions" which have a medical and scientific basis with mere speculation which lacks any scientific or medical foundation.** *See, e.g., Jahn v. Equine Services*, 233 F.3d 382 (6th Cir 2000) (holding that inferences based upon known scientific principles are admissible into evidence). **In fact, trained experts commonly extrapolate from existing data, and may properly do so**. *See, e.g., General Electric Co. v. Joiner*, 233 F.3d 382 (1997).

Dr. Shiener is qualified to testify as an expert here. He has been studying and training psychology since 1967. **(Exhibit 10, Shiener CV at 1).** He has taught psychology since 1978. *Id.* at 2. He is board certified in psychiatry, neurology,

MARKOLAW.COM

1300 BROADWAY ST. | 5TH FLOOR
DETROIT, MI 48226

P: (313) 777-7LAW
F: (313) 771-5785

MARKO LAW

addiction medicine, addiction psychiatry, forensic psychiatry, geriatric psychiatry, psychosomatic medicine, and brain injury medicine. *Id.* at 5–6. He has received many honors and awards for his work in psychiatry, he has been published numerous times, and he has given uncountable lectures on psychiatry at many different universities, hospitals, seminars, and lectures. *Id.* at 6–18.

Dr. Shiener did not conclude that Plaintiff had a "regular and problematic" use of marijuana and alcohol. In fact, Dr. Shiener explicitly reports "Rule out Alcohol Use Disorder" as part of his diagnostic impression. *Id.* at 6. Further, Dr. Shiener recognized Plaintiff's use of mind-altering substances yet still found that Plaintiff's psychiatric damages were caused by being terminated. *Id.*

Similarly, Dr. Shiener's entire report discussed Plaintiff's psychiatric distress, and the symptoms it caused, and Dr. Shiener concluded that the posttraumatic stress disorder was caused specifically by Defendants' termination of Plaintiff. *Id.* at 7.

Therefore, Defendants have failed to establish how Dr. Shiener's report is unreliable in any way under the relevant United States Supreme Court case law.

## III.    CONCLUSION AND RELIEF REQUESTED

WHEREFORE, for the foregoing reasons, Plaintiff respectfully requests this Honorable Court DENY Defendants' Motion in Limine for each category of evidence Defendants have asked this Court to exclude.

Respectfully submitted,

29

*/s/ Jonathan R. Marko*

Jonathan R. Marko (P72450)

**MARKO LAW, PLLC**

1300 Broadway, Fifth Floor

Detroit, MI 48226

(313) 777-7529 / Fax: (313)771-5728

Dated: September 29, 2021     jon@markolaw.com

### PROOF OF SERVICE

The undersigned certifies that the foregoing instrument was served upon all parties to the above cause to each attorney of record on **September 29, 2021** via:

☐ U.S. Mail                  ☐ Fax
☐ Hand Delivered             ☐ Overnight Carrier
☐ Certified Mail             ☐ Other:  Mi-FILE Truefiling
☒ ECF System                 ☐ Email

*/s/ Maysaa Hijazi-Zeitoun*

30